NO. 07-07-0390-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JANUARY 15, 2009
_____

DIRK MATHIS,

Appellant

v.

WILLIAM A . CARTER, EXECUTOR OF THE
ESTATE OF HARRIET CARTER, DECEASED, AND
AS SUCCESSOR TRUSTEE OF THE HARRIET
CARTER TRUST,

Appellee
_____

FROM THE COUNTY COURT AT LAW NO. 2 OF POTTER COUNTY;

NO. 93,885-2; HON. PAMELA C. SIRMON, PRESIDING
_____

*Memorandum Opinion*
_____

Before QUINN, C.J., CAMPBELL AND HANCOCK, JJ.

Dirk Mathis (Mathis) appeals a declaratory judgment wherein the trial court determined that the house located at 2217 Peach Tree Street (the residence) was habitable and that the Harriet Carter Trust had no obligation to complete renovations to the property. Mathis claims that the evidence is insufficient to support the findings that the house in which he was granted the right to live was habitable and that the Harriet Carter

Trust was not required to complete the remodeling which the house was undergoing at the time of Mrs. Carter's death. We affirm.

## Background

According to the record, Mathis had lived in the home located at 2217 Peach Tree in Amarillo, Texas, prior to Harriet Carter's death. The home was undergoing extensive renovations which included a new addition at the time Mrs. Carter died and upon leaving a will she created a trust wherein she granted Mathis a right to "live in" the home.[1] Mrs. Carter also established through the trust "income from the trust assets . . . shall pay taxes and upkeep of [] the residence at 2217 Peach Tree, Amarillo, Texas, . . . ." At the hearing, however, William Carter (William), as trustee, did not believe that "upkeep" included the completion of the additions. Mathis thought differently.[2] The trial court eventually sided with William and found that Mathis could live in the house without William completing the additions.

## Standard of Review

When interpreting a will or trust, the rules of construction are well settled. *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex. App.–Houston [1st Dist.] 2003, no pet.). First, their construction is a question of law susceptible to *de novo* review. *Id.* (*citing Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 286 (Tex. App.–Houston [1st Dist.] 1995, no writ)). Second, we construe both wills and trusts to ascertain the intent of the maker. *Id., citing Jewett v. Capital Nat'l Bank*, 618 S.W.2d 109, 112 (Tex. Civ. App.–Waco

[1]However, at the conclusion of the declaratory judgment hearing, Mathis represented to the court that he no longer claimed a life estate interest in the residence.

[2]Renovations had been completed in the original portion of the residence.

2

1981, writ ref'd n.r.e.). Third, the intent of the maker must be ascertained from the language used in the four corners of the instrument. *See Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 151 (Tex.1980) (applying this concept to construe a will). Fourth, the terms used must be harmonized to properly give effect to all parts of the instrument. *Hutton v. Methodist Home*, 615 S.W.2d 289, 292 (Tex. Civ. App.–Fort Worth 1981, writ ref'd n.r.e.). That is, the court should construe the instrument to give effect to all provisions so that no provision is rendered meaningless. *Myrick v. Moody,* 802 S.W.2d 735, 738 (Tex. App.–Houston [14th Dist.] 1990, writ denied). Fifth, if the court can give a "certain or definite legal meaning or interpretation" to the words of an instrument, the instrument is unambiguous. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Alternatively, if the meaning of the instrument is uncertain or "reasonably susceptible to more than one meaning," the instrument is ambiguous. *Id.*

### *Analysis*

As shown in the record, the house was undergoing renovations. That is, rooms were being added to the existing home when Mrs. Carter died. Furthermore, in that portion of the home undergoing construction, there were exposed electrical wires and pipes, missing toilets and sinks, scattered construction materials, disconnected appliances, missing walls, and an opening in the wall between the completed home and the addition. However, other evidence illustrated that Mrs. Carter was living in the completed portion of what we call the original home, that the addition of a door in the opening between the original home and additions would seal out the dust and debris emanating from the portion undergoing construction, and that the original home was in itself a house with functioning

3

bedrooms, baths, kitchen, living room, utilities, running water, and sanitary facilities. Again, Mrs. Carter was living in it immediately before her death. Moreover, nothing of record suggests that the original home was either unsanitary or unsound.

Next, Mathis was given the "right to live in the house" as long as he lived. Furthermore, trust assets (save for some unrelated to the controversy before us) were to be used to pay for "taxes and upkeep." Yet, the trust instrument did not define the terms "live" and "upkeep." Nonetheless, we can see some interrelationship between the words. For instance, it seems rather logical that before one can "live" in a house, it must be habitable. Indeed, the plain meaning of the phrase "live in" encompasses the idea of inhabiting a place. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 601 (10th ed. 1995) (defining inhabit)*.* Furthermore, to be habitable, an abode must be safe, sanitary and otherwise fit for humans to inhabit. *Kamarath v. Bennett*, 568 S.W.2d 658, 660-61 (Tex.1978) (talking about the warranty of habitability). As for the word "upkeep," it connotes the idea of "maintaining" something (as opposed to creating it). *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1375 (11th ed. 2003) (defining upkeep). Given this, then the individual responsible for "upkeep" of the home, *i.e.* William, would be obligated to undertake those measures needed to maintain the residence in a safe and sanitary condition fit for human habitation. And, that Mrs. Carter (a frail, wealthy, elderly woman) lived in the original home while rooms were being added to it is somewhat telling. That is some evidence that the abode was capable of being inhabited in a safe and sanitary manner at the time of her death. This seems especially so since the original home could be separated from the purported dangers of the bare wiring, missing toilets, and debris

4

present in the area undergoing development through the construction of a door. Nor can we forget that while the addition may not be completed, the original home nonetheless had running water and utilities, heat and air conditioning, a functioning sewer system, bedrooms, living areas and a kitchen. So too was it furnished in many respects.

Of similar import is the fact that Mathis was not granted a fee interest in the house via the trust instrument. Rather, he simply had a "license" to use it when he was in Amarillo, or so the trial court found.[3] In other words, it was not his home but rather a place where he could stay when in town. That express provision was not made in the trust instrument or its amendments for completing the construction is also of import since the amendment granting Mathis the right to live in the house was executed weeks before her death, while the construction was ongoing, and though she knew she had terminal cancer.

So, under the circumstances before us, we cannot say that the trial court erred in relieving William of any obligation to complete the room additions as a part of his duty to maintain the house so that Mathis could inhabit it. In so concluding, though, we express no opinion on what measures, if any, the trustee must undertake to prevent the uncompleted construction from inhibiting Mathis' use of the existing home. That is left for another day.

Accordingly, the trial court's judgment is affirmed.


Brian Quinn
Chief Justice

---

[3]The record illustrates that Mathis resided in Dallas, not Amarillo.

5